# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3669 and 01 C 1844 | **DATE** | 11/3/2003 |
| **CASE TITLE** | STANLEY DAVIS JONES vs. SHERIFF MICHAEL SHEAHAN, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ ___.

(3) ☐ Answer brief to motion due___ . Reply to answer brief due ___ ___.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on ___ ___ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ___ ___ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER. Defendants' motion for a new trial or to alter judgment (99 C 3699: doc. # 162) is DENIED. Defendants' alternative motion for a *remittitur* of the punitive damages awards is GRANTED. The Court orders a *remittitur* of the punitive damages awards to reduce them from $500,000 to $100,000 against Ernest Velasco, and from $250,000 to $50,000 against James Edwards. The plaintiff shall file a pleading on or before 12/02/03, in which he states whether he accepts the *remittitur* of the punitive damages awards. If accepted, the judgment will be amended to reduce the punitive damages awards against Mr. Velasco to $100,000, and against Mr. Edwards to $50,000. If the *remittitur* is rejected, the Court will order a new trial on the issue of punitive damages.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | number of notices | | |
| ✓ | Notices mailed by judge's staff. | NOV 4 2003 | | 175 |
| | Notified counsel by telephone. | date docketed | | |
| | Docketing to mail notices. | AJK docketing deputy initials | | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | 11/3/2003 | | |
| | courtroom deputy's initials | date mailed notice | | |
| | | mailing deputy initials | | |

U.S. DISTRICT COURT

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
**NOV - 4 2003**

STANLEY DAVIS JONES,          )
                             )
            Plaintiff,        )
                             )   Nos. 99 C 3669 and 01 C 1844
vs.                          )
                             )   Magistrate Judge Schenkier
SHERIFF MICHAEL SHEAHAN, *et al.*,  )
                             )
            Defendants.       )

## MEMORANDUM OPINION AND ORDER

In these consolidated cases brought pursuant to 42 U.S.C. § 1983, the plaintiff, Stanley Jones,

asserted claims for alleged constitutional violations he allegedly suffered while at the Cook County

Department of Corrections ("Cook County Jail").[1]  After various pretrial rulings, the defendants

remaining for trial were Cook County; Michael Sheahan, in his official capacity as the Sheriff of

Cook County; Ernest Velasco, both individually and in his official capacity as former Director of

Cook County Jail; James Edwards, both individually and as in his official capacity as former

Superintendent of Division IX of Cook County Jail; Henry Troka, both individually and in his

official capacity as former Superintendent of Division XI of Cook County Jail; and Eleanor Kyles,

both individually and in her official capacity as a Correctional Officer at Cook County Jail. A jury

trial commenced on July 21, 2003 on the following claims against these defendants: (1) claims of

unlawful conditions of confinement against Messrs. Edwards and Velasco in their individual

capacities, and against those defendants and Mr. Sheahan in their official capacities and against Cook

---

[1]Pursuant to 28 U.S.C. § 636(c) and the consent of the parties, Case Nos. 99 C 3669 (doc. ## 23-25) and 01 C 1844 (doc. ## 42-44) were reassigned to this Court for all proceedings, including the entry of final judgment, on February 3, 2000 and April 25, 2002, respectively. By an order dated April 16, 2002, the cases were consolidated (No. 01 C 1844; doc. # 41).

County; (2) a claim for failure to protect Mr. Jones from a March 7, 1999 attack by other inmates, asserted against Messrs. Edwards, and Velasco in their individual capacities and against those defendants, Mr. Sheahan in their official capacities, and against Cook County; (3) a claim against Mr. Edwards in his individual capacity asserting that he retaliated against Mr. Jones for exercising his First Amendment rights to petition for redress of grievances; (4) a claim for failure to protect Mr. Jones from a July 31, 1999 attack by other inmates, asserted against Mr. Troka, Mr. Velasco and Ms. Kyles in their individual and official capacities, and against Cook County; and (5) a claim asserting that Mr. Troka, in his individual capacity, retaliated against Mr. Jones for exercising his constitutional rights.

After the close of the plaintiff's evidence, the Court granted judgment as a matter of law under Federal Rule of Civil Procedure 50 in favor of the defendants on the conditions of confinement claims; in favor of Messrs. Troka and Velasco in their individual and official capacities in connection with the claim for failure to protect in connection with the July 31, 1999 attack; and in favor of Ms. Kyles in her official capacity on that claim. At the close of the case, the Court submitted to the jury Mr. Jones's claims against Messrs. Edwards and Velasco (individually and officially), Mr. Sheahan (officially) and Cook County on the failure to protect claims based on the March 7, 1999 attack; against Ms. Kyles (individually) in connection with the failure to protect claim based on the July 31, 1999 attack; and on the retaliation claims against Messrs. Edwards and Troka (in their individual capacities).

After nearly seven hours of deliberation, the jury returned a verdict in favor of the defendants on the failure to protect claim relating to the July 31, 1999 attack, and on both retaliation claims. The jury returned a verdict in favor of Mr. Jones and against Messrs. Edwards and Velasco

2

(individually and officially), Mr. Sheahan (officially) and Cook County on the failure to protect claim stemming from the March 7, 1999 attack. The jury awarded Mr. Jones compensatory damages of $25,000 for the injuries he suffered in the March 7, 1999 attack. The jury also assessed punitive damages in the amount of $250,000 against Mr. Edwards and $500,000 against Mr. Velasco (99 C 3669: doc. # 158). The Court entered judgment on that verdict (99 C 3669: doc. # 195).

Now pending before the Court is a motion by defendants Edwards, Sheahan, Velasco and Cook County, pursuant to Federal Rules of Civil Procedure 50(a), (c) and 59(e) to grant them a new trial or to alter judgment (99 C 3669: doc. # 162). The motion attacks the sufficiency of the evidence to support the jury's verdicts of liability; challenges various legal rulings made by the Court prior to and during trial; and, assuming the liability verdicts stand, seeks a new trial or, in the alternative, a *remittitur* of the punitive damages awards.[2]

A new trial will not be granted unless "the verdict stands against the weight of the evidence or if, for other reasons, the trial was not fair to the losing party." *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 939 (7th Cir. 2001). When assessing the sufficiency of the evidence, the Court considers whether any rational jury could find for the plaintiff, considering the evidence in the light most favorable to him. *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 630 (7th Cir. 1996). When considering a claim that a new trial is warranted due to legal errors, we assess the record in the backdrop of the proposition that "[c]ivil litigants are entitled to a fair trial, not a perfect one . . . [A] new trial will not be ordered unless there was an error that raised some prejudice to the substantial rights of the parties." *Wilson v. Groaning*, 25 F.3d 581, 584 (7th Cir. 1994) (quoting

---

[2]The plaintiff has not filed a post-trial motion challenging the Court's grants of judgment as a matter of law under Rule 50, or the jury's verdicts in favor of the defendants on the failure to protect claim relating to the July 31, 1999 attack or the two retaliation claims.

*Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993). Accordingly, a party seeking a new trial based on allegedly erroneous evidentiary rulings bears a "heavy burden." *Alverio*, 253 F.3d at 939. The party must show an abuse of discretion in the Court's evidentiary rulings, which is difficult to do. *See Rodriguez v. Anderson*, 973 F.2d 550, 553 n.3 (7th Cir. 1992) (discretionary rulings will be reversed only if they "strike us as wrong with the force of a five-week-old, unrefrigerated dead fish"). And, the moving party must show that any errors were "substantial enough to deny him a fair trial." *Wilson*, 25 F.3d at 584. *See also Hasham v. Calif. State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000) (evidentiary errors warrant a new trial "only if a significant chance exists that they affected the outcome of the trial").

For the reasons set forth below, the Court denies the defendants' motion for a new trial or to alter the judgment – at least insofar as the alteration of judgment sought by the defendants is for judgment to be entered for them. However, we grant the defendants' alternative request for a *remittitur* of the punitive damages award.

## I.

We begin with the challenge by Messrs. Velasco and Edwards to the jury verdict finding them liable in their individual capacities for the March 7, 1999 attack on Mr. Jones, viewing the evidence in the light most favorable to Mr. Jones. On that date, Mr. Jones was a pretrial detainee housed in Division IX of the Cook County Jail. Mr. Jones, who was approximately 52 years old at the time, was a "neutron" – a term understood by inmates and prison officials alike to refer to those persons who are not affiliated with any street gang. In the Protective Custody Unit of Division IX, as well as elsewhere at Cook County Jail, "neutrons" are not separated from gang members in their housing assignments or in other aspects of prison life. On March 7, 1999, Mr. Jones was sitting at

4

a table with another "neutron," Raphael Valderrama, when Mr. Jones was accosted by two gang members who beat and dragged him. As a result of that attack, Mr. Jones suffered a dislocated shoulder and a broken wrist.

"[P]rison officials have a duty . . . to protect prisoners from violence from the hand of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct' . . . having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (citations omitted). However, this obligation to protect prisoners does not make the government the absolute guarantor of their safety. Rather, "if deliberate indifference by prison officials effectively condones the attack by allowing it to happen, those officials can be held liable to the injured victim." *Haley v. Gross*, 86 F. 3d 630, 640 (7th Cir. 1996) (citing *Farmer*, 511 U.S. at 834). To sustain a claim of deliberate indifference, a plaintiff must show, *first*, a danger that is "objectively serious, posing a substantial risk of serious harm," *Haley*, 86 F.3d at 640, and *second*, that the danger was one that the official "knows of and disregards." *Id.* at 641. The Seventh Circuit has explained that where there is proof that prison officials have actual knowledge of a harm that can easily be prevented, "a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991), *cert. denied* 503 U.S. 907 (1992) (quoting *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985)).

The case law emphasizes that actual knowledge of the dangerous condition is a fundamental prerequisite to establishing a claim of deliberate indifference. "It is not enough that a reasonable prison official would or should have known that the prisoner was at risk: the official must actually

5

know of and disregard the risk to incur culpability." *Lewis v. Richards,* 107 F.3d 549, 553 (7th Cir. 1997) (citing *Farmer,* 511 U.S. at 837-38). However, as is true in other areas of the law, actual knowledge may be proven even in absence of direct evidence:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer,* 511 U.S. at 842 (citations omitted). Thus, "[w]hile a jury is not required to infer actual knowledge from the conspicuous nature of a risk, it is allowed to do so." *Haley,* 83 F.3d at 641.

The deliberate indifference standard does not require proof that prison officials acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," or that the prison officials believed "that harm actually would befall an inmate. It is enough that the official act or fail to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at 842 (quoted in *Haley,* 86 F.3d at 641).

At the same time, a plaintiff "may not attribute any of his constitutional claims to higher officials by the doctrine of *respondeat superior;* 'the official must actually have participated in the constitutional wrongdoing.'" *Antonelli v. Sheahan,* 81 F.3d 1422, 1428 (7th Cir. 1996) (quoting *Cygnar v. City of Chicago,* 865 F.2d 827, 847 (7th Cir. 1989)). Thus, "§ 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim." *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir. 2003). This standard, too, may be met either by proof of direct participation in alleged constitutional violation or by "a showing that the [official] acquiesced in some demonstrable way in the alleged constitutional violation." *Id.* In deciding whether that showing has been made against senior officials, the Court must consider

whether the alleged constitutional violation relates to an isolated episode or, instead, to a more systemic or chronic situation. *Antonelli*, 81 F.3d at 1428-29 (while senior officials could not "realistically be expected to be personally involved in resolving a situation pertaining to a particular inmate unless it were of the gravest nature," senior officials "can be expected to know of or participate in creating systemic, as opposed to localized, situations").

In light of these governing principles, we review the evidence offered at trial concerning the substantial risk of serious harm to Mr. Jones, and the deliberate indifference of Messrs. Edwards and Velasco.[3]

## A.

The evidence at trial was sufficient to permit a jury reasonably to conclude that the failure to separate gang members from "neutrons" at Cook County Jail was "objectively serious," and posed "a substantial risk of serious harm." *Haley*, 86 F.3d at 640. John Maul, who has been employed by Cook County Jail for more than 28 years and who, in 1999, was the assistant director of Cook County Jail, testified at trial (both by deposition and in person). Mr. Maul testified that he had discussions with Mr. Velasco concerning gang activity at Cook County Jail, and that "[i]t's known that non-gang members are known as neutrons and that we have to, in most cases, place them separately from the rest of the jail population" (Maul Dep. 68-69). Mr. Maul further testified that information about gang affiliation is obtained when processing inmates upon arrival at Cook County

---

[3] Because Mr. Jones was a pretrial detainee at the time of the events in question and had not been convicted of any crime, "his § 1983 claim is analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause." *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002). However, as the Seventh Circuit has consistently held, that distinction is without a difference in a claim such as this, as "§ 1983 claims brought under the Fourteenth Amendment are to be analyzed under the Eighth Amendment test." *Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999); *see also Palmer*, 327 F.3d at 593; *Butera*, 285 F.3d at 605 n.2.

Jail, but is not then used in assigning inmates their housing classification (except for known gang chiefs, who are put in a special incarceration unit) (*Id.* at 47-48). As a general matter, then, gang members would be processed and assigned housing in the same manner as non-gang members (*Id.* at 49). And, that includes assignments to the Protective Custody Unit, for which no consideration was given to whether a person is a gang member or a "neutron" (*Id.* at 64).

Mr. Maul's testimony on these points confirm what the other witnesses said at trial: there is a need to separate gang and non-gang members at Cook County Jail. Mr. Jones testified to several attacks experienced prior to the incident on March 7, 1999 while he was in Division IX. Raphael Valderrama, who is not affiliated with a gang, testified that he was housed in Division IX and in 1998 and 1999 when he was raped by gang members on three separate occasions. Another witness called by Mr. Jones, Wyler Kendrick Berry, testified to the relationship between gang members and "neutrons" in Division IX at Cook County Jail in 1999.[4] Mr. Berry testified to the pervasive control that gang members exercise at Cook County Jail – down to gang members having the sway to determine who gets served meals first. Mr. Berry testified to a pervasive threat of violence that gang members present to "neutrons" because, unlike gang members, "neutrons" are unaffiliated and thus have no cohorts to defend them if attacked. Mr. Berry testified that "neutrons" are thus "aggression sinks," meaning that they are safe targets for gang members to attack, without fear of retaliation.

---

[4]Mr. Berry was in Division IX for a period of time shortly after the March 7, 1999 incident. However, Mr. Edwards testified at trial that there were no steps taken to separate gang members and "neutrons" in Division IX after the March 7, 1999 incident. Given that testimony, Mr. Berry's testimony concerning the relationship of gang members and "neutrons" in Division IX was relevant – and, the defendants do not claim otherwise in their post-trial motions.

The defendants raise several challenges to the sufficiency of this evidence showing that there existed a substantial risk of serious harm to neutrons like Mr. Jones at Cook County Jail resulting from the failure to separate them from gang members. We do not find these challenges persuasive.

*First*, the defendants raise a variety of challenges that, in our judgment, improperly ask the Court to substitute its judgment for that of the jury in assessing matters of credibility. The defendants suggest that, contrary to Mr. Jones's testimony, he did not experience three attacks prior to the events of March 7, 1999. That argument challenges Mr. Jones's credibility on this point, a challenge that the jury was entitled to resolve in Mr. Jones's favor. The defendants further argue that neither those prior attacks (if they occurred) nor the March 7, 1999 attack were motivated by Mr. Jones's status as a "neutron" – which, again, asks the Court to make a credibility choice that is different from the one made by the jury at trial. Likewise, the defendants suggest that the testimony of Mr. Berry should have been disregarded because he was never assaulted and never personally witnessed an assault by a gang member on a "neutron." But, the jury that heard Mr. Berry's testimony also was presented with the evidence now recited by the defendants, and the jury obviously chose to accept his testimony.

*Second*, the defendants argue that Mr. Jones was not subject to a substantial risk of serious harm as of March 7, 1999, because by that time he had already been transferred to the Protective Custody Unit. However, while inmates in protective custody are separated from the general prison population, they have access to each other – as was demonstrated by the March 7, 1999 attack on Mr. Jones. The evidence offered both by Mr. Jones and Mr. Maul established that no effort was made to separate gang members from non-gang members who were placed in protective custody – even though, according to Mr. Maul, it was known among prison officials that "neutrons" had to be

9

separated from gang members. Accordingly, a jury reasonably could have concluded that the assignment of Mr. Jones to protective custody did not remove the substantial risk of serious harm.

*Third*, the defendants argue that Mr. Jones failed to produce sufficient evidence of systemic gang targeting because he failed to provide statistics or other evidence concerning the number or frequency of incidents of violence inflicted by gang members on "neutrons." To be sure, had the plaintiff offered such evidence, it might have made for a stronger case; but we do not believe that the absence of this evidence makes for an insufficient one. There are a number of ways to prove gang targeting, and the plaintiff did so here by offering testimony from people housed in Division IX at Cook County Jail, which he bolstered with testimony from Mr. Maul confirming that "it's known that non-gang members are known as neutrons and that we have to, in most cases, place them separately from the rest of the jail population" (Maul Dep. at 68-69). In our judgment, that evidence only confirmed the common-sense conclusion that such a separation was necessary, so that a "state of nature [would not] take its course." *Farmer*, 511 U.S. at 833.

To the extent that the defense had evidence to contradict Mr. Maul's testimony – either by other occurrence witnesses or by offering statistical evidence showing that incidents of violence by gang members against "neutrons" were infrequent – the defense was free to offer it. The defense also was free to point out to the jury the failure of the plaintiff to offer any statistical evidence to bolster his case. The defense did not do so, and cannot now complain that the evidence that the plaintiff adduced was insufficient evidence for the jury to find a substantial risk of serious harm from the failure to separate "neutrons" from gang members.[5]

---

[5]We recognize that in affirming a summary judgment ruling for the defendants, the *Lewis* court cited to the plaintiff's failure to present "evidence of the number or frequency of incidents of inmate-on-inmate violence at the [prison]." *Lewis v. Richards*, 107 F.3d 549, 555 (7th Cir. 1997). However, in that case, there appears to have been no

10

## B.

Turning to the question of deliberate indifference, we consider separately the evidence as it pertains to Mr. Edwards and Mr. Velasco.

### 1.

Mr. Edwards was the Superintendent of Division IX at the time of the events in question. Plainly, he was aware that no efforts were made to separate gang members from "neutrons" within the Division – including in the Protective Custody Unit. The evidence also was sufficient to permit the jury to determine that Mr. Edwards was aware that this arrangement presented a substantial risk to Mr. Jones, as a "neutron."

*First*, knowledge can be inferred by the obviousness of the risk. *Farmer*, 511 U.S. at 842; *Haley*, 86 F.3d at 641. A jury could have reasonably found that the risk was obvious based on the testimony of Mr. Jones and Mr. Valderrama; the testimony of Mr. Berry describing the gang members use of "neutrons" as "aggression sinks"; and the testimony of Mr. Maul that even more senior officials, such as he and Mr. Velasco, knew of the need to separate gang members from non-gang members. And, indeed, Mr. Edwards testified that he walked through Cook County Jail on a daily basis, which would have brought him into contact with this obvious risk on a regular basis.

*Second*, the jury was presented with evidence that Mr. Jones told Mr. Edwards, prior to the March 7, 1999 incident, that he was at risk from gang members because of his lack of gang affiliation. While the defense called into question whether those statements were made, that was a matter of credibility for the jury to decide.

---

evidence from prison officials recognizing the danger from failing to separate gang and non-gang members – unlike the case here, given the testimony of Mr. Maul.

11

Moreover, the evidence was sufficient to establish that Mr. Edwards disregarded this known risk created by failing to separate gang and non-gang members. For the reasons described above, placing Mr. Jones in the Protective Custody Unit was not sufficient to address the risk, because gang members and non-gang members were commingled within that unit. Nor did the defense offer any evidence to suggest that it would have been impossible, or even difficult, to separate gang and non-gang members. Mr. Maul's testimony established that information about gang affiliation is obtained from inmates when they are initially processed at the institution. The defense offered no evidence to show why that information could not have been used to separate gang and non-gang members. Indeed, the evidence showed that there are special wings at Cook Count Jail for other definable groups (such as a "Christian wing"). The defense offered no evidence to show why there likewise could not be a separate wing or division for neutrons. If an official is aware of a substantial risk of serious harm, but "devise[s] no policies or devise[s] inadequate policies to attempt to prevent the assault, he would be 'deliberately indifferent.'" *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002). The evidence presented was sufficient to allow the jury to reach that conclusion as to Mr. Edwards here.[6]

## 2.

The evidence also was sufficient for a jury to conclude that Mr. Velasco had actual knowledge of the substantial risk of serious harm created by intermingling gang and non-gang members. The defense correctly points out that there is no evidence that Mr. Velasco was aware of

---

[6]We are aware of Seventh Circuit authority holding that Cook County Jail is not required to separate members of one gang from members of another gang, based on the impracticality of doing so. *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001) ("The number of gang members housed by the CCDOC and the high representation of certain gangs would place an unmanageable burden on prison administrators were they required to separate inmates by gangs.") No evidence of similar impracticality or burden has been presented here.

12

any specific risk by an identifiable person to Mr. Jones – indeed, there is no evidence that he even knew that Mr. Jones was housed at Cook County Jail in 1999. However, we do not believe that the absence of such evidence is fatal to plaintiff's case, because plaintiff proceeded on a theory that did not depend on such evidence. Mr. Jones's theory of liability was premised on a substantial risk of serious harm that was systemically created for persons who were "neutrons" (like Mr. Jones) by exposing them to gang members.[7]

Mr. Maul's testimony establishes that Mr. Velasco knew of the need to separate gang members from neutrons. The evidence at trial offered through witnesses who were present at Cook County Jail on a regular basis (either as inmates or prison officials) show that this kind of separation was not done – even in the Protective Custody Unit. Mr. Maul's testimony established that he knew that separation of gang members from non-gang members was not generally being made, knowledge which he possessed as assistant director of Cook County Jail. While Mr. Velasco's duties as Director of Cook County Jail might not have required his day-to-day presence at Cook County Jail, Mr. Maul's testimony was that Mr. Velasco regularly visited Cook County Jail, perhaps on a monthly basis (Maul Dep. at 68). Moreover, policies for housing inmates are the kind of systemic matter that a senior official such as Mr. Velasco "can be expected to know of or participate in creating." *Antonelli*, 81 F.3d at 1429. And, Mr. Maul testified that he had conversations with Mr. Velasco about gang activity at Cook County Jail, and that Mr. Velasco was aware of the need to separate "neutrons" from gang members (Maul Dep. 68-69).

---

[7] The failure to identify a specific threat has, in some cases, been fatal to a failure to protect claim. *See, e.g., Butera*, 285 F.3d at 605-06. However, in those cases, the threat complained of by the plaintiff was the result of a specific episode (such as, "snitching" on a gang member), and not the result of the kind of systemic situation complained of here by Mr. Jones. In this case, there is evidence from which the jury could conclude that both Mr. Edwards and Mr. Velasco had actual knowledge of the systemic situation complained of by Mr. Jones (the failure to separate gang from non-gang members), and the substantial risk of serious harm that this situation presented to people who were not gang members.

Accordingly, we find that the jury had sufficient evidence upon which to base a conclusion that Mr. Velasco had notice of a substantial risk of serious harm to "neutrons" like Mr. Jones stemming from the failure to separate them from gang members. And, for the reasons explained above with respect to Mr. Edwards, we find that there was evidence from which the jury could reasonably conclude that Mr. Velasco failed to respond reasonably to that substantial risk. We therefore find that there was sufficient evidence from which the jury could find Mr. Velasco personally liable.

We are aware that the "existence or possibility of other better policies which might have been used does not necessarily mean that the [jail officials were] being deliberately indifferent." *Palmer*, 327 F.3d at 593 (quoting *Butera*, 285 F.3d at 605). However, the jury fairly could have concluded that this case did not present a question of the defendants merely selecting one policy rather than another for dealing with the substantial risk of serious harm from gang violence against non-gang members. The evidence allowed the jury to conclude that the defendants instead opted to have no policy at all. There was evidence that prison officials were aware of the need to separate gang members from non-gang members; that they obtained information about gang affiliation that would allow them to make that separation; but that they then failed to institute any practice or policy designed to separate gang members from non-gang members. While the defendants point to the use of protective custody as a means of addressing this risk, the evidence was that there was no separation of gang from non-gang members within the Protective Custody Unit – as is confirmed by the ready access that gang members had to Mr. Jones for the March 7, 1999 attack. The evidence at trial was sufficient to afford the jury a reasonable basis to conclude that the defendants' response to the substantial risk of serious harm to "neutrons" from being routinely exposed to gang members

was unreasonable. *See J.H. & J.D. v. Johnson*, No. 02-1964, 2003 WL 22319570 (7th Cir. Oct. 10, 2003) ("'Deliberate indifference' is found where an actor responds unreasonably to a substantial and known risk . . . .").

## II.

In addition to finding Messrs. Edwards and Velasco individually liable under Section 1983, the jury returned a verdict finding those defendants and Mr. Sheahan liable in their official capacities under Section 1983 - with the result that Cook County also was held liable. The defendants argue that the evidence was insufficient to find these defendants liable in their official capacities for a Section 1983 violation. The Court disagrees.

By agreement of the parties, the jury was instructed that in order to find official capacity liability for March 7, 1999 attack, Mr. Jones was required to prove by preponderance of the evidence two elements: *first*, that there was a violation of plaintiff's constitutional rights under the Fourteenth Amendment as a result of the March 7, 1999 attack, and *second*, that the constitutional violation "was the result of an 'official policy'" (Jury Instruction No. 16). That agreed instruction further advised the jury that an official policy means: "(1) an express policy of Cook County, or (2) a widespread practice at the Cook County Correctional Facility that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) the actions of a person with final policy-making authority" *Id.*

For the reasons explained above, the Court finds that the evidence was sufficient to allow the jury to find the first element of official capacity liability – that is, that the March 7, 1999 attack violated Mr. Jones's constitutional rights. We also find the evidence was sufficient to permit a jury to find that the constitutional violation was the result of an "official policy," in the form of a

15

"widespread practice." Mr. Maul, who was the assistant director of Cook County Jail in 1999, testified that while gang chiefs or leaders are housed in a special incarceration unit that is separate from the rest of the prison population, other gang members routinely are housed randomly with neutrons - including those who are assigned to the Protective Custody Unit. Moreover, Mr. Edwards testified that there were no changes in this system of assignment after the March 7, 1999 attack – which was corroborated by Mr. Berry's testimony about the intermingling of gang and non-gang members in Division IX when he was present there in the latter part of 1999. We believe that a jury reasonably could conclude from this evidence that there was an "official policy" of housing gang members together with non-gang members both in general population and in protective custody, and that this policy lead to the constitutional violation plaintiff suffered by virtue of the March 7, 1999 attack.

We have considered the defendants' arguments to the contrary, but find them unpersuasive. *First*, the defendants argue that deliberate indifference requires evidence of a pattern of violations, citing *Bd. of County Comm'rs. v. Brown*, 520 U.S. 397, 407-08 (1997), and *Boyce v. Moore*, 314 F.3d 884, 891 (7th Cir. 2002). However, those decisions stand for the proposition that proof of a pattern of violations may establish deliberate indifference; they do not establish that such proof is the sole means by which deliberate indifference may be proven. *Second*, the defendants argue that Mr. Jones failed to present evidence of violence perpetrated by gang members on non-gang members while in protective custody, except for the March 7, 1999 attack. While the jury might have found that evidence sufficient to undermine plaintiff's contention that housing gang and non-gang members together created a "substantial risk of serious harm," the jury here obviously did not reach that conclusion. And, in light of all of the evidence in the case – including the testimony establishing that

16

prison officials knew of, but failed to act on, the need to separate gang from non-gang members; the testimony by Mr. Berry of the threat presented by gang members to non-gang members; the testimony of Mr. Jones and Mr. Valderrama about the attacks they suffered; and the evidence that gang members have the same access to non-gang members in the Protective Custody Unit as they do in general population – the jury was not required to reach the conclusion urged by the defendants.

## III.

The defendants have raised a number of challenges to legal rulings that the Court made prior to and during trial. For the reasons set forth below, we reject each of these challenges.

## A.

Prior to trial, plaintiff filed a motion *in limine* to bar evidence of Mr. Jones's prior convictions for murder, criminal sexual assault, theft of services and possession of controlled substances. The Court ruled on that motion in a written opinion. *Jones v. Sheahan*, No. 99 C 3669 & 01 C 1844, 2003 WL 21654279 (N.D. Ill. Jul. 14, 2003). The arguments the defendants raise in their post-trial motions already have been fully addressed in the Court's *in limine* ruling. For the reasons stated in that prior ruling, the Court denies defendants' post-trial motion on this issue.[8]

---

[8] We note that in making their post-trial argument, the defendants continue to argue – as they did in opposing the motion *in limine* – that because Mr. Jones is the plaintiff in a civil case and not the accused in a criminal matter, the excluded prior convictions must be admitted under Federal Rule of Evidence 609(a)(1) without balancing the probative value of those convictions against the danger of unfair prejudice under Federal Rule of Evidence 403 (Defs.' Motion at 8-9). As they did in opposing the motion *in limine*, the defendants rely on case law that predated the 1990 Amendments to Rule 609, which specifically amended Rule 609 to state that the admissibility of evidence that a witness other than an accused has been convicted of a crime that does not involved dishonesty or false statement is "subject to Rule 403." The defendants never acknowledge that amendment to Rule 609, and indeed, when quoting the relevant portion of Rule 609(a)(1), they use an ellipsis to omit the portion of the Rule that specifically incorporates the Rule 403 balancing test. That kind of sleight-of-hand citation approach does not advance the defendants' argument – or their credibility.

17

**B.**

On July 16, 2003, the defendants filed a motion *in limine* to bar the testimony of Dr. Craig Beyer, a retained expert who offered opinions concerning the injuries Mr. Jones suffered in the March 7, 1999 attack. Dr. Beyer expressed the opinions that Mr. Jones suffered a dislocated shoulder and a broken wrist in that attack. Dr. Beyer opined about the pain that would be associated with those injuries, the continuing of effect of those injuries, and the risk that Mr. Jones would experience future problems as a result of each of those injuries.

On July 21, 2003, immediately before the commencement of the jury selection process, the Court orally ruled on the motion *in limine*. The Court denied the defendants' motion to bar Dr. Beyer's testimony on the ground of untimely disclosure, finding that the defendants had suffered no prejudice because they had had the opportunity to depose Dr. Beyer and to retain their own expert (whom the defendants elected not to call at trial). The Court also denied defendants' motion to bar Dr. Beyer's opinion that Mr. Jones would suffer a ten to twenty percent chance of instability and further dislocation of the injured shoulder. Upon reviewing Dr. Beyer's deposition testimony, the Court concluded that there was a sufficient basis for Dr. Beyer to offer that opinion in view of his experience in treating more than 1000 dislocations, and his reference to published articles on the topic setting forth statistics on the risk of recurrent instability and dislocations (*see* Defs.' Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Dr. Craig A. Beyer, M.D., Ex. B at 10, 15, 19). The Court also denied the defendants' motion to bar Dr. Beyer from offering an opinion that Mr. Jones suffered a fractured wrist in that incident.

Defendants' post-trial motion challenges only the Court's *in limine* ruling allowing Dr. Beyer to testify concerning Mr. Jones' shoulder injury and his likelihood of suffering future instability and

18

dislocations, arguing that this testimony "was clearly based solely on prior general experience with patients who have suffered shoulder dislocations" (Defs.' Post-Trial Motion at 9). That argument ignores that Dr. Beyer considered not only his general experience in treating some 1000 shoulder dislocations, but also his review of the medical records concerning the treatment Mr. Jones received in the March 7, 1999 attack, as well as articles addressing the likelihood that a person who suffers one shoulder dislocation will suffer further instability and dislocations in the future.

As amended in 2000 in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.3 Acres of Land Situated in LeFloure, County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996) (citing *Daubert*, 509 U.S. at 596.). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

In this case, the defendants do not challenge Dr. Beyer's qualifications as an expert, but they do quarrel with the factual basis on which he relied for his opinion. However, the defendants have offered no evidence or authority to indicate that medical experts do not routinely base opinions on

a review of medical records (as Dr. Beyer did in this case), or that medical experts do not routinely resort to scholarly articles in developing their opinions (as Dr. Beyer did here). Although the defendants' brief attacks Dr. Beyer's use of statistical evidence, the defendants failed to develop through cross-examination or competing expert testimony that medical experts do not routinely rely on such information in forming opinions. The defendants have failed to establish that there was any error in allowing Dr. Beyer's testimony.

## C.

One of the defendants in this case, Mr. Velasco, failed to attend any phase of the trial. During closing argument, plaintiff's counsel brought this to the jury's attention when discussing the testimony of Mr. Maul, who had made references to conversations with Mr. Velasco about the housing of gang and non-gang members: "[W]e don't know what Mr. Velasco would say about that because he didn't bother to show up [at trial]" (Pl.'s Mem. at 6 (Ex. A, at 824)). The defendants objected to that comment on the ground that there is no requirement that the defendant personally attend trial. The Court overruled that objection.

In their post-trial motion, the defendants reassert that objection. However, we see nothing inappropriate about the plaintiff calling to the jury's attention Mr. Velasco's absence. While it is true that Mr. Velasco was not required to attend his trial (since he was not called to testify by either side), the defendants have cited no authority to show that it was improper for the plaintiff to draw the jury's attention to his absence. The sole authority cited by the defendants is *McGill*, which held that defendants "need not attend the proceedings just because they have been named as parties," 944 F.3d at 353, but did not address the propriety of the plaintiff referring to their absence.

The defense would have been free to suggest (for example, during jury selection), that Mr. Velasco's absence was a result of reasons other than any disinterest in the case or disrespect for the process. The defense elected not to do so, perhaps for strategic reasons that we do not know of and are not entitled to inquire into. But, having remained mute on the point, the defense cannot legitimately complain that it was improper for the plaintiff to point out a fact which, in any event, was evident to the jury – that Mr. Velasco had not been present for any portion of the trial.

## D.

The defendants complain that the Court improperly limited their opportunity to cross-examine Mr. Jones with letters that were attached to the complaint, but that were not listed as exhibits in the pretrial order. A review of the transcript (Pl.'s Mem., Ex. A at 310-11) reveals that the Court did not prohibit the defense from using those letters in the cross-examination. Rather, the Court made it clear that while the letters could not be used as marked exhibits (since they were not listed on the pretrial order), they could be used to refresh recollection or to impeach the witness if there first was established a basis to do so.

The cross-examination that followed the Court's ruling revealed that the purpose of using the letters was to establish  - if Mr. Jones denied it – that his letters to prison officials did not complain about gang targeting, but did ask that Mr. Valderrama be designated his cell mate (Pl.'s Mem., Ex. A at 311-15). The defense asked about those matters in connection with two letters written by Mr. Jones shortly after the March 7, 1999 attack. It proved unnecessary for the defense to use the letters to refresh Mr. Jones's recollection or to impeach him, because Mr. Jones acknowledged that in those letters he did not reference gang targeting and that he did ask that Mr. Valderrama be moved to his cell.

21

The defense then indicated that it wanted to use a number of additional letters to make the same point: that the letters did not contain complaints about gang targeting, but did ask for Mr. Jones to be housed with Mr. Valderrama. The Court reiterated its ruling that the defense would not be allowed to use as exhibits attachments to the complaint that were not listed as exhibits on the pretrial order, and further indicated that the inquiry into other letters in which Mr. Jones did not specifically make reference to gang targeting but asked that Mr. Valderrama to be assigned as his cell mate would be cumulative (*Id.* at 319 ("we don't need to gild the lily")).

The defense was fully able to show that Mr. Jones wrote various letters in which he did not raise a concern about gang targeting, but stated that he did want Mr. Valderrama as a cell mate. Error is not created merely by the fact that the jury ultimately failed to find those points persuasive.

## E.

The defendants argue that the jury was improperly instructed as to the law regarding individual capacity liability. They focus their attack on Instruction No. 14, which told the jury that the plaintiff was required to prove each of the following elements by a preponderance of the evidence:

> First, that inmate Terrence Walker and/or Pedro Manzanalles struck, hit or kicked the Plaintiff on March 7, 1999; and

> Second, that the plaintiff belonged to an identifiable group of prisoners for whom the risk of assault was a serious problem of substantial dimensions, because of targeting by gangs; and

> Third, that the Defendants were deliberately indifferent to the substantial risk of such an attack; and

> Fourth, that the Defendants' deliberate indifference resulted in harm to the Plaintiff.

22

The defendants challenge this instruction on the ground that the jury should have been told that for individual capacity liability to exist, the defendants had to be aware that Mr. Jones was assigned to the Protective Custody Unit of Division IX, and that there was a substantial risk of serious harm to the plaintiff from gang violence in the Protective Custody Unit of Division IX (Defs.' Motion at 5-7).

The defendants' argument assumes that the risk of non-gang members being exposed to gang violence was less in the Protective Custody Unit than it was in general population. It was certainly an argument that the defense was entitled to make, based on lack of evidence of specific incidents of such attacks (other than the one against Mr. Jones) against "neutrons" in the Protective Custody Unit at Division IX. However, the plaintiff's theory of the case was that non-gang members such as Mr. Jones were exposed a substantial risk of serious harm from gang violence *everywhere* within Cook County Jail, whether in general population or in the Protective Custody Unit. That theory was supported by evidence that prison officials knew of the need to separate gang members from non-gang members, but did not do so – either in general population or in protective custody. We are not persuaded that there was any error in instructing the jury on the theory of the case advanced by the plaintiff, because that theory was supported by the evidence.

## IV.

We now turn to the defendants' argument that the punitive damages awards against Messrs. Edwards and Velasco were excessive, and that the Court should grant a new trial on punitive damages or, in the alternative, a *remittitur*. In this case, the parties submitted an agreed instruction

23

on punitive damages.[9] The Court made revisions to the agreed instruction, to which the parties agreed, and the jury accordingly was instructed on punitive damages pursuant to Instruction No. 21.[10]

---

[9]The agreed instruction tendered by the parties states as follows:

> In addition to the damages mentioned in other instructions, the law permits the jury under certain circumstances to award the injured person punitive damages in order punish the defendant for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct. Punitive damages cannot be assessed against Defendant Cook County, but only against individual Defendants.

> If you find in favor of Plaintiff and against a Defendant, and you find that the actions of that Defendant as submitted in Instructions 21 through 30 was callously and recklessly indifferent to Plaintiff's needs, then, in addition to any other damages to which you find Plaintiff entitled, you may award Plaintiff an additional amount as punitive damages if you find that it is appropriate to punish the Defendant or deter the Defendant and others from like conduct in the future. Whether to award the Plaintiff punitive damages and the amount of those damages are within your sound discretion. In general a ratio of 1:1 between compensatory and punitive damages is appropriate in most cases.

> You may assess punitive damages against any or all Defendants or you may refuse to impose punitive damages. If you assess punitive damages against more than one Defendant, the amounts assessed against each Defendant may be the same or they may be different.

[10]Instruction No. 21, which was presented to the jury by agreement, reads as follows:

> In addition to the damages mentioned in other instructions, the law permits the jury under certain circumstances to award the injured person punitive damages in order to punish the defendant for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct. Punitive damages cannot be assessed against Defendant Cook County, but only against individual Defendants.

> If you find in favor of the Plaintiff and against an individual Defendant, and you find that the actions of that Defendant were callously and recklessly indifferent to the Plaintiff's needs, then, in addition to any other damages to which you find the Plaintiff entitled, you may award the Plaintiff an additional amount as punitive damages if you find that it is appropriate to punish that Defendant or deter that Defendant and others from like conduct in the future.

> If you find that punitive damages are appropriate, then you must use sound reason in setting the amount of those damages. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes of punitive damages that I have described to you, but should not reflect bias, prejudice or sympathy toward any party. Whether to award the Plaintiff punitive damages and the amount of those damages are within your sound discretion. In general a ratio of 1:1 between compensatory and punitive damages is appropriate in most cases.

Both as originally tendered and as subsequently modified and given to the jury, the punitive damage instruction stated that punitive damages could be assessed only against individual defendants and not against Cook County, and that if punitive damages were awarded, "[i]n general a ratio of 1:1 between compensatory and punitive damages is appropriate in most cases."

The jury awarded Mr. Jones $25,000.00 in compensatory damages for the injuries he suffered in the March 7, 1999 attack, which -- reading the evidence most favorably to Mr. Jones – included both a dislocated shoulder and a fractured wrist. The defendants do challenge the compensatory damage award as excessive or unsupported by the evidence, and we find nothing about that award to be excessive. In the face of an instruction suggesting a one-to-one ratio between punitive and compensatory damages, if punitive damages were awarded at all, the jury nonetheless awarded punitive damages against Mr. Edwards of $250,000 and Mr. Velasco of $500,000: ten times and twenty times, respectively, the compensatory damage award.

In the Court's view, the punitive damages awards are not symptomatic of "runaway jury," that acted out of bias, prejudice or sympathy – which the jury was told in Instruction No. 21 it could not use as the basis for any punitive damages award. The jury returned defense verdicts on three of the four claims submitted to them -- including a retaliation claim against Mr. Edwards. Thus, the jury verdicts as a whole do not reflect any antagonism toward the defendants.[11] Moreover, the Court

---

You may assess punitive damages against any or all Defendants or you may refuse to impose punitive damages. If you assess punitive damages against more than one Defendant, the amounts assessed against each Defendant may be the same or they may be different.

[11] Not that the defendants, by their trial conduct, didn't invite the jury's antagonism. Mr. Edwards sat slouched at counsel table throughout much of the trial with a toothpick dangling from his mouth. During his testimony, Mr. Edwards referred to the plaintiff as a "heathen." And, Mr. Velasco did not show up at trial at all – without explanation. This conduct certainly could have been interpreted as showing disrespect for the plaintiff and for the trial process – as well as a level of continuing "deliberate indifference" that was worthy of substantial punitive damages.

believes that the jury gave careful consideration both to the evidence and the jury instructions. The jury deliberated for some seven hours over the evidence submitted in a three and one-half day trial. And, the one question that jury submitted to the Court during its deliberations reflected its careful scrutiny of the jury instructions: with respect to Instruction No. 15, the jury asked whether the word "intentionally" used in the phrase "intentionally refusing or failing" modified both the word "refusing" and the word "failing," or only modified the word "refusing."[12] The question provided a window into the level of scrutiny given by the jury to the instructions, and gives the Court confidence that the jury gave similar scrutiny to the other instructions – including the instruction on punitive damages.

Accordingly, we believe that the punitive damages awards reflected the jury's considered judgment as to the amount of punitive damages appropriate "to punish the defendant for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct" (Instruction No. 21). But, the question remains whether the amounts awarded by the jury nonetheless violate due process.

In *State Farm Mutual Auto Insurance Co. v. Campbell*, 123 S.Ct. 1513 (2003), the United States Supreme Court, in its most recent pronouncement on the subject, reiterated its holdings in earlier decisions that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." 123 S.Ct. at 1519-20. The Supreme Court explained that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictates that a person receive fair notice not only of the conduct that will subject them

---

[12] After hearing the arguments of the parties and doing independent research, the Court gave the jury a response that was in line with what the defense requested. The defendants do not assign any error either in the use of Instruction No. 15, or in the answer the Court gave to the jury's question about it.

to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 1520 (quoting *BMW v. Gore*, 517 U.S. 559, 574 (1996)). The Court explained that "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 1520.

The Supreme Court reaffirmed the guideposts, announced earlier in *Gore*, for courts to use in reviewing punitive damages awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at 1520 (citing *Gore*, 517 U.S. at 575). We assess the punitive damages award in this case against these three guideposts.

## A.

We start with the degree of reprehensibility of the conduct of Messrs. Edwards and Velasco, which the Supreme Court has cited as "the most important indicium of the reasonableness of a punitive damages award." *Id.* at 1521 (quoting *Gore*, 517 U.S. at 575). The factors to consider in assessing the degree of reprehensibility of conduct include:

> Whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mutual*, 123 S.Ct. at 1521.

Several of these factors squarely apply in this case. The harm suffered by Mr. Jones was physical: he suffered a dislocated shoulder and (viewing the evidence most favorably to Mr. Jones)

a broken wrist in the March 7, 1999 attack. The tortious conduct here involved, by definition, an "indifference to . . . the health or safety of others." *Id.* at 1521. The liability finding reflects the jury's determination that the housing of gang members intermingled with non-gang members presented a substantial risk of serious harm to non-gang members such as Mr. Jones, that Mr. Edwards and Mr. Velasco were "deliberately indifferent" to that risk (meaning that they had knowledge of the risk and yet disregarded it by intentionally refusing or failing to take reasonable measures to deal with the problem), and that this deliberate indifference resulted in the harm that Mr. Jones suffered in the March 7, 1999 attack. Moreover, the deliberate indifference of Messrs. Edwards and Velasco was not an isolated incident, as might be the case if one of them had knowledge that a specific inmate had threatened an imminent attack and failed to take action to prevent it. Rather, the conduct here involved a systemic and continuing disregard of the risk of serious harm and the unwillingness to take any steps to separate gang members from non-gang members in housing assignments – despite evidence that it was generally known by prison officials that "we have to, in most cases, place [non-gang members] separately from the rest of the jail population" (Maul Dep. at 68-69). A jury reasonably could consider it to be "reprehensible" for prison officials to disregard such a known, substantial risk of serious harm.

On the other hand, certain of the factors identified as relevant to assessing the degree of reprehensibility cut the other way. The instructions informed the jury that a finding of deliberate indifference did not require proof that a defendant "desires that the harm befall an inmate" (Instruction No. 15). Thus, the jury verdict of liability cannot be interpreted to reflect a finding that there was "intentional malice" involved in the conduct of Mr. Edwards or Mr. Velasco. Nor was there any evidence offered that would support such a finding. While the deliberate indifference

28

found by the jury involved a systemic problem that Mr. Edwards and Mr. Velasco knew about but failed to address (that is, the intermingling of gang and non-gang members in housing assignments), the evidence concerning the extent to which other non-gang inmates in Cook County Jail suffered violence at the hands of gang members is sparse. The jury was presented with evidence of the attacks against Mr. Valderrama, but there is no evidence of other attacks. And, there is no evidence that "non-gang members" have financial vulnerability, or that financial vulnerability is relevant to the analysis here.[13]

In assessing the evidence in light of the factors set forth for determining the degree of reprehensibility, the Court finds no error in the jury's award of some amount of punitive damages. However, in light of the scant evidence concerning the extent to which the deliberate indifference resulted in physical harm to non-gang members and the absence of evidence of intentional malice, the Court concludes that "a more modest punishment for this reprehensible conduct could have satisfied the . . . legitimate objects" of punitive damages. *State Farm Mutual*, 123 S.Ct. at 1521.

**B.**

We next consider the relationship between the harm suffered by Mr. Jones and the punitive damages award. The purpose of this consideration is to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and the general damages recovered." *State Farm Mutual*, 123 S.Ct. at 1524. The Supreme Court has declined to "identify concrete constitutional limits on the ratio between harm, or potential harm to the plaintiff and the

---

[13]The plaintiffs argue that non-gang members are financially vulnerable because they do not possess the resources to hire an attorney, and therefore many suits they may file concerning gang targeting are dismissed at the pleading stage (Pl.'s Mem. at 13). That speculative argument is not supported by any evidence that was submitted at trial, or by statistics showing numbers of suits by inmates claiming gang targeting and the reasons for the dismissal – if, in fact, there are numerous cases making such claims that have been dismissed. Accordingly, the Court rejects this argument.

punitive damages award." *Id.* However, the Supreme Court has made clear that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 1524. In so holding, the Court made reference to earlier decisions suggesting that a punitive damages award "of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.*, (citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991), and *Gore*, 517 U.S. at 581). The Supreme Court noted that "punitive damages awards of higher ratios to compensatory damages *may* comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.*, (quoting *Gore*, 517 U.S. at 582) (emphasis added).

Since *State Farm Mutual*, appeals court decisions in this Circuit have affirmed punitive-to-compensatory damages ratios that were at the very limit of single-digit ratios, *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478 (7th Cir. 2003) (upholding a punitive damages award in a Title VII case that could be interpreted as nine times the compensatory damages award), and that have exceeded a single-digit ratio. *Mathias v. Accor Econ. Lodging, Inc.*, No. 03-1010 & 03-1078, 2003 WL 2238963 (7th Cir. Oct. 21, 2003) (upheld a punitive damages award in a common law tort case that was 37.2 times the compensatory damages awards). On the other hand, trial courts within this district have reduced punitive damages awards that reflected substantial double – or triple digit multiples of compensatory damages. *See, e.g., Waits v. City of Chicago*, No 01 C 4010, 2003 WL 2131077 (N.D. Ill. June 6, 2003) (reduced two punitive damages awards that were 33.3 and 100 times a $15,000 compensatory damages award to levels that reflected ratios of 1.33-to-1 and 1.67-to-1). What these cases demonstrate is that the propriety of any particular ratio of punitive to compensatory damages is driven by the "facts and circumstances of the defendant's conduct and the

harm to the plaintiff," *State Farm Mutual*, 123 S.Ct. at 1524, and that "the judicial function is to police a range [of punitive damages], not a point." *Mathias*, 2003 WL 22389863, at *5.

In this case, the punitive damages awards against Mr. Velasco and Mr. Edwards are twenty times and ten times, respectively, the compensatory damage award of $25,000. The fact that these awards reflect a multiple of compensatory damages that exceeds the "single-digit ratio between punitive and compensatory damages," and far exceeds the four-to-one ratio that the Supreme Court has suggested "might be close to the line of constitutional impropriety," raises a cautionary flag. While the reprehensibility of the defendants' conduct gave the jury the discretion to award some level of punitive damages, for the reasons explained above, we do not believe the degree of reprehensibility warranted the double-digit ratios of punitive to compensatory damages awarded by the jury here.

The plaintiff argues that because the jury was properly instructed as to punitive damages, and in particular was instructed that a ratio of one-to-one between compensatory and punitive damages would be appropriate in most cases, the jury's judgment about the amount to be awarded should be accepted (Pl.'s Mem. at 14-15). We agree that the instruction informing the jury as to what generally would be an appropriate ratio of punitive to compensatory damages addressed certain concerns expressed by Supreme Court about "[v]ague instructions" which give the jury little guidance in awarding punitive damages, *State Farm Mutual*, 123 S.Ct. at 1520. But, we do not agree that a proper instruction immunizes a jury's punitive damage award from due process review. Under *State Farm Mutual*, the Court has an obligation to assess the punitive damage award against the dictates of due process, employing the factors enunciated by the Supreme Court for consideration. Analyzing

those factors, we cannot agree that the ratio between punitive and compensatory damages awarded by the jury here should be upheld merely because the instruction was appropriate.

The plaintiff also asserts that a large ratio of punitive damages to compensatory damages was appropriate here because the compensatory damage award of $25,000 was "relatively low" (Pl.'s Mem. at 15). We are not persuaded by this argument. We agree that the compensatory damages awarded was not so substantial that "a lesser ratio, perhaps only equal to compensatory damages can reach the outermost limit of the due process guarantee." *State Farm Mutual*, 123 S.Ct. at 1524. At the same time, while the Court does not believe (and the defendants do not argue) that the $25,000 compensatory damage award was excessive, neither was it penurious. Thus, this case does not strike us as one where compensatory damages are so low that a double-digit multiplier of punitive damages might be permissible. *See Mathias*, 2003 WL 22389863, at *4 (higher levels of punitive damages may be appropriate where the compensatory damages are so low that victims lack the incentive or means to sue, so as to discourage defendants to be able to "commit the offensive act with impunity").

## C.

The final guidepost for assessing punitive damages is the "disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *State Farm Mutual*, 123 S.Ct. at 1526 (quoting *Gore*, 517 U.S. at 575). On this question, the plaintiff has cited two excessive force cases, *Grauer v. Donovan*, No. 92 C 3186, 1996 WL 82462 (N.D. Ill. 1996), and *King v. Macri*, 800 F. Supp. 1157, 1163 (S.D. N.Y. 1992) (Pl.'s Mem. at 15-16). In our view, neither of those cases advanced the plaintiff's position.

In *Grauer*, the jury awarded $50,000 in compensatory damages and $500,000 in punitive damages in an excessive force case where the injuries were emotional and reputational. 1996 WL

82462, *1. On post-trial motions, the district court ordered a *remittitur* reducing the compensatory damage award to $25,000, and reduced the punitive damage award to $5,000 – a ratio of punitive to compensatory damages of far less than one-to-one. *Id.*, *6-8.

In *King*, the jury considered a claim of excessive force, arrest without probable cause, and malicious prosecution. 800 F.Supp. 1157. On the excessive force and arrest claims, the jury returned verdicts for the plaintiff awarding no compensatory damages, but punitive damages of $50,000 against one defendant and $125,000 against another defendant. *Id.* at 1160. With respect to the malicious prosecution claim, the jury awarded $75,000 in compensatory damages and $75,000 in punitive damages against one defendant. *Id.* In denying a post-trial motion, the district court held that punitive damages can be awarded for constitutional violations even in the absence of a compensatory damage award. *Id.* at 1163-64. The court also rejected a challenge to the various damages awards as excessive. *Id.* The court held that a $75,000 compensatory damage award for two months of wrongful incarceration was not excessive, and that "the award of punitive damages is not demonstrably excessive, and does not warrant a *remittitur* or a new trial." *Id.* at 1163. Insofar as the court in *King* upheld a $75,000 punitive damage award on the malicious prosecution claim for which $75,000 in compensatory damages was award, a one-to-one ratio, that ruling does not advance plaintiff's argument. Insofar as the Court upheld $50,000 and $75,000 punitive damages awards on claims for which no compensatory damages were awarded, that award may fall within the limited exception that *State Farm Mutual* held "*might* be necessary where 'the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine.'" 123 S.Ct. at 1524 (emphasis in original) (quoting *Gore*, 517 U.S. at 582). But, as we have indicated above and as we discuss further below, that limited exception is inapplicable here.

For their part, the defendants offer only one case in support of their claim that the punitive damages award here exceeds reasonable awards in other cases: *Waits v. City of Chicago*, No. 01 C 4010, 2003 WL 21310277 (N.D. Ill. June 6, 2003) (Defs.' Motion at 13). In *Waits* a jury had returned an award of $15,000 in compensatory damages on an excessive force claim and $500,000 and $1,500,000, respectively, in punitive damages against the two involved officers - punitive-to-compensatory damages ratios of 33.3-to-1 and 100-to1 respectively. 2003 WL 21310277, *1. The district court ordered a *remittitur* of the punitive damages awards, reducing them to $20,000 and $25,000, respectively, 2003 WL 21310277, at *6  which the plaintiff subsequently accepted. In *Waits*, the defendants were found to have committed excessive force by unnecessarily handcuffing the plaintiff behind his back and striking him some fifteen-to-twenty times in the face, head and neck with an open hand and kneeing him in the groin. *Id.* at *1. The court noted a "tremendous variation in punitive damages awards" in other cases, citing *Grauer* and *King* as examples. *Id.* at *6 and n.2. The court reasoned that the examination of comparable cases was for the purpose of deciding whether a defendant was given fair notice as to potential liability, and that in *Waits* there was "simply no way defendants could have fathomed that their conduct would subject them to two-million dollars in penalties." *Id.*, at *6.

The Court also has independently reviewed decisions within the past year from the Seventh Circuit and from this district assessing punitive damages in civil rights cases. We have found recent instances where the Seventh Circuit has affirmed punitive damages awards exceeding the ratio between punitive and compensatory damages reflected in the awards (after *remittitur*) in *Waits*. In *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478 (7th Cir. 2003), a jury returned a compensatory damage award on a retaliation claim of $75,000, and a punitive damage award of $270,000 - for a

total award of $345,000. The district judge (who also presided in *Waits*) reduced the collective compensatory and punitive damages award to $300,000, which was the applicable cap for compensatory and punitive damages awards in a Title VII case. *Lampley*, 340 F.3d at 482. In doing so, the district judge did not specify whether the reduction of $45,000 to reach the $300,000 statutory cap came out of the $75,000 compensatory damage award, or the $270,000 punitive damages award, or both. *Id.* On review, the Seventh Circuit affirmed the reduced award totaling $300,000. *Id.* at 486. The appeals court found that the compensatory damage award was not excessive, whether analyzed as a $75,000 or a $30,000 award. *Id.* at 484. And, the Seventh Circuit held that the punitive damages award also was not excessive, whether deemed to be a $225,000 award or a $270,000 award – which, in the latter instance, would have reflected a ratio of punitive-to-compensatory damages of nine-to-one. *Id.* at 485-86.

Moreover, the Seventh Circuit recently affirmed punitive damages awards to each plaintiff that were more than 37 times the compensatory damages awarded. In *Mathias v. Accor Economy Lodging, Inc.*, No. 03-1010, 03-1078, 2003 WL 22389863 (7th Cir. Oct. 21, 2003), the Seventh Circuit reviewed a jury verdict in favor of two plaintiffs who were attacked by bed bugs while in a hotel operated by the defendant. The jury awarded each plaintiff $5000 in compensatory damages, and $186,000 in punitive damages. On appeal, the defendant argued, among other things, that the punitive damage award was excessive, and that any amount exceeding $20,000 to each plaintiff – a punitive-to-compensatory damages ratio of four-to-one – would deprive the defendant of due process. *Mathias*, 2003 WL 22389863, *3. In rejecting that argument, the Seventh Circuit reviewed both the Supreme Court decision in *State Farm Mutual* and the principles underlying punitive damages.

35

The Seventh Circuit stated that the limitations on punitive damages set forth in *State Farm Mutual* reflect the proposition that "punitive damages should be proportional to the wrongfulness of the defendant's actions," subject to qualification when "the probability of detection is very low . . . or the crime is potentially lucrative . . . ." *Id.*, *3. The reasonableness of a punitive damages award must be measured by whether the defendant would have "reasonable notice" of the sanction that might be imposed for improper actions, and whether the award is based "on the wrong done rather than on the status of the defendant." *Id.*

The Seventh Circuit explained that to determine what particular punitive damages are appropriate in a given case, a court must consider "why punitive damages are awarded in the first place." *Id.* Punitive damages provide a civil alternative to criminal prosecution of minor crimes, in situations where compensatory damages would be insufficient: such as, where compensatory damages are "difficult to determine in the case of accident inflicted largely dignatory harms;" where the injuries suffered are "too slight to give the victim an incentive to sue;" and where compensatory damages are sufficiently low that they would "enable the defendant to commit the offensive act with impunity provided that he was willing to pay" in those cases where a suit was brought. *Id.*, at *4. But, these considerations that provide a rationale for punitive damage tend to "fade" in cases of "huge economic injuries," since awarding "very substantial compensatory damages . . . greatly reduce[s] the need for . . . a huge award of punitive damages." *Id.*

The Seventh Circuit in *Mathias* found that a large punitive damage award was warranted in that case for several reasons. The defendant's behavior was outrageous – the evidence showed that the defendant knew about the infestation of bed bugs and that guests were being bitten by them, but refused to take action; knowingly rented rooms that were infested with bed bugs; and, concealed the

36

risk from unwitting guests. *Id.*, at *2. The compensable harm to the plaintiffs was "slight and at the same time difficult to quantify," and the defendant "may well have profited from its misconduct" by being able to continue to rent the rooms. *Id.*, at *4. The appeals court further found that capping a punitive damages award at four times compensatory damages, as suggested by the defendant, might well cause plaintiffs to have difficulty in financing a lawsuit, and could allow the wealthy defendant in that case to use its resources to make litigation costly – and unattractive – for plaintiffs. *Id.*, at *5.

Given these considerations, the appeals court found that the jury's punitive damage award could not be deemed excessive, while recognizing that the precise number chosen by the jury was arbitrary - as would the precise number selected by any jury or judge in any punitive damages case. *Id.*, at *5. Nonetheless, the Seventh Circuit said that the judicial function with respect to the propriety of a punitive damages award "is to police a range, not a point," and the Court found that the award made by the jury in *Mathias* was within an acceptable range. *Id.*

We could discuss other recent cases, but they would not add to the essential principles set forth in the decisions we have discussed: that our function is to determine whether the punitive damages awards here are within a range that the defendants might expect, and that whether they fit that range will be determined by the particular facts and circumstances of each case.[14] Here, we

---

[14]For some other recent Seventh Circuit and Northern District of Illinois decisions discussing punitive damages, see *David v. Caterpillar, Inc.*, 324 F.3d 851 (7th Cir. 2003) (affirmed district court decision reducing jury verdict in Title VII retaliation case from of $100,000 in compensatory and $750,000 in punitive damages to $50,000 in compensatory damages and $150,000 in punitive damages, declining to "second guess" the district judge's evaluation that that resulting ratio of punitive to compensatory damages reflected "a reasonable relationship between the award and the particular harm that resulted from *Caterpillar's* misconduct"); *Fine v. Ryan International Airlines*, 305 F.3d 746, 754-56 (7th Cir. 2002) affirming award in Title VII retaliation claim of $6000 in compensatory damages and the statutory cap of $300,000 in punitive damages (reduced from the $3.5 million dollars in punitive damages awarded by the jury), finding that the evidence that the company had a policy "of intentionally disregarding the rights of its employees" provided "more than sufficient evidence . . . to sustain the adjusted award of punitive damages"); *Lust v. Sealy, Inc.*, No. 02-C-50-C, 2003 WL 21977222, at *22-23 (W.D. Wis. Aug. 19, 2003) (after jury awarded the plaintiff in a Title VII sex discrimination claim $100,000 for emotional distress damages and $1 million in punitive damages, the district court reduced those amounts to $27,000 and $273,000, respectively, to meet the $300,000 statutory cap for compensatory and punitive

believe that the punitive damages awards do exceed what the defendants reasonably could have expected as a result of the conduct for which they have been found liable. The factors cited by the Seventh Circuit in finding the punitive damages awards in *Mathias* were not excessive do not, in the main, apply here. This is not a case where the damages were difficult to determine; rather, Mr. Jones suffered physical injuries which are of the type that juries consider and determine damages for routinely. This is not a case where the harm was too slight to motivate a plaintiff to file a lawsuit; a plaintiff who suffers a dislocated shoulder and a broken wrist as a result of misconduct surely is motivated to sue, as Mr. Jones did here. This is not a case where there is any evidence that the defendants sought to conceal the conduct giving rise to liability here, or that they in any way profited from that misconduct. And, defense counsel did not engage in litigation tactics calculated to unnecessarily inflict costs.

Further bolstering our conclusion that the level of punitive damages here exceeded what defendants reasonably could have anticipated is the fact that both sides here agreed to a punitive damage instruction stating that in most cases a one-to-one ratio between punitive and compensatory damages would be appropriate. That, of course, was no guarantee that the jury would agree with that precise ratio. On the other hand, submitting such an instruction suggests to the Court that the parties did not expect a jury to award multiples of ten and twenty times the amount of actual damages.

---

damages under Title VII, rejecting a request to find the reduced amount excessive in light of the fact that the punitive damages award already had been reduced by 73% to meet the statutory cap; that a lesser amount might not be sufficient to deter the intentional misconduct to the defendant, which had $1 billion in sales each year; and that a further reduction could be viewed as "denigrating the jury's very function in this trial") (citations omitted); *Filipovich v. K & R Express Sys., Inc.*, No. 98 C 4610, 2003 WL 1463531, *13-15 (N.D. Ill. Mar. 21, 2003) (on retaliation claim in which a jury awarded $300 in back pay and $126,423 in punitive damages, the district court reduced the punitive damages to $25,000, which the court considered to be the "constitutional limit" in punitive damages in that case given that the defendant's conduct did not appear to be "among the most reprehensible or egregious retaliatory actions a company could take against an employee"; the punitive damages awards in comparable cases did not approach the amount awarded by the jury there; and the court considered the reduced amount sufficient to punish and deter the defendant corporation, which was "plainly not a mega-corporation for which a $25,000 would be mere pocket change").

That is not to say that this is a case where the punitive damages were constitutionally limited to an amount equal to compensatory damages. The fact that the parties agreed to an instruction to submit to the jury on punitive damages reflects their understanding that if the jury found liability, the evidence was sufficient to permit – although not require – a jury to award punitive damages. And, as we explained above, the evidence here supports the conclusion that the defendants' conduct was egregious in a degree that would support some award of punitive damages. We also consider it significant that the compensatory damage award, while not insignificant, is not of such a high level that it would alone be likely to deter repetition of the conduct in question. That is particularly so since the compensatory damage award (unlike a punitive damage award) would be borne by the county, and not by Messrs. Edwards and Velasco personally.[15]

## D.

To summarize the foregoing punitive damages analysis, the Court finds that there was sufficient evidence from which the jury could find that Mr. Edwards and Mr. Velasco engaged in

---

[15]We note that the defendants argue that the punitive damage award here is excessive because it would "bankrupt the defendants," whom they say are "now retired and living on government pensions" (Defs. Motion at 13, 14). However, the defendants offered no evidence at trial as to the financial status of Mr. Edwards or Mr. Velasco. The Court may not review a punitive damages award based on the defendant's alleged financial status, when the defendants chose not to offer evidence of financial status at trial. See Kemezy v. Peters, 79 F.3d 33, 36 (7th Cir. 1996) (observing that the failure of defendants to offer evidence of their net worth, for fear that the jury will interpret this as conceding the appropriateness of awarding punitive damages, "is just the kind of thinking that has so often led defendants into disaster when they decided not to put into evidence their own estimate of the damages to which plaintiff is entitled, but instead played the equivalent of double or nothing").

The defendants also argue that because Messrs. Edwards and Velasco "are retired and no longer involved in corrections . . . the imposition of punitive damages would not serve any deterrent effect on defendants" (Defs.' Reply Mem. at 7). Punitive damages in this case nonetheless would punish these two defendants for their conduct, and would send a message to others that a decision to engage in such conduct is not a cost-free one. These goals of deterrence and retribution are the legitimate province of punitive damages, as the Supreme Court reiterated in State Farm Mutual, 123 S.Ct. at 1519, and as the defendants recognized by the punitive damage instruction they agreed should be given to the jury. See Instruction No. 21 ("[T]he law permits the jury under certain circumstances to award the injured person punitive damages in order to punish the defendant for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct").

reprehensible conduct and that punitive damages should be awarded. However, the Court concludes that the punitive damages awarded by the jury are excessive when measured against federal due process standards. We do not believe that these defendants would have had fair notice that they were subject to levels of punitive damages as severe as those imposed by the jury here in light of the nature and extent of the injuries to the plaintiff; the lack of proof of any intentional malice; and the lack of any proof that the defendants either sought to conceal their conduct or profited by it.

That leaves the question of what amount of punitive damages is appropriate. We may not unilaterally reduce the punitive damages awards, but instead must decide whether to order a new trial on punitive damages or to propose a *remittitur* – which, if rejected, will result in a new trial on punitive damages. *See, e.g., McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir. 1984). Recognizing that it is "inevitable that the specific amount of punitive damages awarded whether by a judge or a jury will be arbitrary," *Mathias*, 2003 WL 22389863, at *5, the Court nonetheless concludes that proposing a *remittitur* of punitive damages to a specific amount would be preferable to simply vacating the punitive damages award and having a new trial on that issue alone.

The Court therefore orders a *remittitur* of punitive damages that reduces those damages to $50,000 for Mr. Edwards and $100,000 for Mr. Velasco. We conclude that punitive damages awards of those amounts are appropriate in that they respect the jury's assessment that this was not an ordinary case in which a one-to-one ratio of punitive to compensatory would be appropriate; they reflect a ratio of punitive to compensatory damages acceptable under due process analysis; and, they preserve the jury's assessment of the relative amount of punitive damages to be awarded against Messrs. Edwards and Velasco (which could be read to reflect a reasonable determination that Mr. Velasco, as the superior officer in a position to dictate changes in housing policy for Cook County

40

Jail, was deserving of a higher level of punishment than Mr. Edwards). Nor are these reduced awards beyond what the defendants reasonably might have expected. The jury was told that a one-to-one ratio of punitive to compensatory damages "in general" was appropriate in "most cases." Defendants reasonably could expect a punitive damages multiple of two to four times compensatory damages if the jury found that a higher ratio was appropriate in *this* case. By ordering this *remittitur*, the Court gives the plaintiff the option of either excepting the *remittitur*, and the resultant lower award of punitive damages, or of rejecting the *remittitur* and having a new trial limited solely to the issue of punitive damages. *See McKinnon*, 750 F.2d at 1391; *Waits*, 2003 WL 21310277 at *7.[16]

## CONCLUSION

For the foregoing reasons, the defendants' motion for a new trial or to alter judgment is DENIED. Defendants' alternative motion for a *remittitur* on the punitive damages awards is GRANTED. The Court orders a *remittitur* of the punitive damages awards to reduce them from $500,000 to $100,000 against Mr. Velasco, and from $250,000 to $50,000 against Mr. Edwards. Plaintiff shall file a pleading on or before December 2, 2003, in which he states whether he accepts

---

[16] In *Filipovich*, the district judge found it appropriate to reduce the punitive damage award to an amount deemed to be the "maximum amount permitted by the Constitution," rather than to order a *remittitur* which, if rejected, would result in a new trial. 2003 WL 1463531, at *14. The court reasoned that a *remittitur* is appropriate "when it believes the jury's award is *unreasonable* on the facts," whereas a constitutional reduction is a determination "that the law does not permit the award." *Id.* (quoting *Johansen v. Combustion Eng'g., Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999)) (emphasis in original). However, we question whether there is so clean a distinction between a finding that a jury award of punitive damages is "unreasonable" because it is excessive based on the facts, or is constitutionally "unreasonable" because it is excessive – a determination that examines first and foremost the facts before the jury at trial. The *Johansen* court noted that other courts have followed the traditional path of offering a plaintiff the choice of a *remittitur* or a new trial upon finding that a punitive damages award was excessive under a due process analysis, 170 F.3d at 1332, and while concluding that offering a *remittitur* was not constitutionally required, recognized that "the Constitution does not prohibit this cautious approach." *Id.*

Neither of the parties here has raised this issue in their post-trial submissions. We opt to order a *remittitur* here, and thus avoid any Seventh Amendment issues. *See Hertzel v. Prince William County, Va.*, 523 U.S. 208,211 (1998) ("enter[ing] judgment for a lesser amount than that determined by the jury without allowing the petitioner the option of a new trial, cannot be squared with the Seventh Amendment").

41

the *remittitur* of the punitive damage award. If accepted, the judgment will be amended to reduce the punitive damages awards against Mr. Velasco to $100,000 and against Mr. Edwards to $50,000. If the *remittitur* is rejected, the Court will order a new trial on the issue of punitive damages.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: November 3, 2003